BANK OF POPLAR BLUFF, A CORPORATION, GUY CRUCE AND IMAL CORAL CRUCE, RESPONDENTS, v. WILLIAM CASEY, D/B/A CASEY MOTOR COMPANY, APPELLANT.—231 S. W. (2) 851.

Springfield Court of Appeals. Opinion delivered July 10, 1950.

*Cope & Ponder* for appellant.

*Phillips & Phillips* for respondent.

BLAIR, J.—This case involves the right of respondents to maintain an injunction suit to prevent appellant from removing certain property, alleged by appellant to be personal property, from Lot Thirteen (13) in Block One (1), etc., located in the city of Poplar Bluff, Butler County, Missouri.

A petition was filed in the Circuit Court of Butler County, Missouri, on July 7, 1948, by Respondent Bank of Poplar Bluff, a Corporation. It afterwards appeared that respondents Guy Cruce and Imal Coral Cruce claimed some interest in the particular property, by reason of a purchase by them of the described real property from respondent Bank, subject to its deed of trust thereon, and their names were added as plaintiffs in an amended petition.

On April 12, 1949, defendant, now appellant, filed his answer to such amended petition. The trial court entered its findings and judgment on August 9, 1949. Defendant filed his motion for a new trial in proper time. The trial court overruled defendant's motion for new trial on September 13, 1949. Such defendant filed his notice of appeal to this Court on September 21, 1949. The time for pre-

paring and filing the transcript on appeal was afterwards extended. The case is thus before us for consideration.

Both appellant and respondents agree that this Court, and not the Supreme Court, has appellate jurisdiction. The amount involved is well within the appellate jurisdiction of this Court; but we are, not bound by the consent of the parties to the appellate jurisdiction of this Court, if the Supreme Court actually has such appellate jurisdiction. In that event, it would be our duty to transfer the case to the Supreme Court, notwithstanding such consent. Lammering v. Gerhardt (Mo. Supreme Court) 229 S. W. 338, and cases cited.

The Supreme Court has exclusive appellate jurisdiction where the title to real estate is in issue, regardless of the amount involved. Article V, Section 3, of the 1945 Constitution. So the question for us to decide is whether or not the title to real estate is involved in this case, regardless of the agreement of appellant and respondents that appellate jurisdiction is in this Court and not in the Supreme Court.

In Hilton v. The City of St. Louis, 129 Mo. 389, 1. c. 391, Judge Macfarlane, speaking for the Supreme Court, said:

"The constitution does not declare that the jurisdiction exists if a question of title is involved in the trial, but that the case tried must involve the title. We take the provision to mean that the title to real estate must, in some way, be affected by the judgment to be rendered on the entire case as made by the pleadings and evidence. This seems to be the view this court has uniformly taken. Bobb v. Wolff, 105 Mo. 52; Blondeau v. Sheridan, 103 Mo. 134; Bailey v. Winn, 113 Mo. 161; State ex rel. v. Rombauer, 124 Mo. 598."

This rule has apparently been followed by the Supreme Court ever since the case above cited. Fischer v. Johnson, et al. 139 Mo. 433, 41 S. W. 203; Schroer v. Brooks, (Mo. Supreme Court) 200 S. W. 1068. The case of Gray v. Worst, 129 Mo. 122, has been overruled.

We therefore must rule that the title to real estate is not involved in this case, regardless of whether or not the items claimed by appellant were part of the real estate at the time he secured possession of the real estate, or were previously or at any subsequent time separated from such real estate, as a part thereof.

Among other things, the trial court found as follows:

"The Court further finds that John Robertson bought the real estate described in plaintiff's petition and in evidence from one Ed West and moved there in August of 1947 and on November 3, 1947, he and his wife executed a note secured by a deed of trust on said property to the plaintiff, Bank of Poplar Bluff, which was recorded in the office of Recorder of Deeds on the same date.

"The Court further finds that at the time of the note and deed of trust to the plaintiff Bank of Poplar Bluff, said plaintiff's

agent inspected the real estate described in the petition in evidence and that there was then attached thereto one furnace, one furnace blower, one furnace stoker, furnace pipes, electric water cooler, fluorescent electric lights, equipment, fixtures and switches, all of which have been described in evidence and are in issue in this cause and which are the same items included in the chattel mortgage aforesaid to the Robertson Motor Company and later assigned to the Butler County Finance Company; that the furnace was attached to a concrete base with stoker attached and stoker coal in the coal bin; that pipes from the furnace had been inserted through floors and walls to reach their destination for the purpose of supplying heat; that the fluorescent light fixtures were attached to the ceiling at places used in the conduct of the affairs of a garage building and the electric water cooler was installed in a filling station located on said property and adjacent to the garage building.

"The Court further finds that John Robertson doing business as the Robertson Motor Company used the real estate and buildings there on as a garage and automobile sales building and filling station in conjunction therewith; that he moved into said properties in the fall and operated all of it and that the furnace, stoker, blower, fluorescent light fixtures, equipment and switches and the electric water cooler were attached and annexed to the property and by their use adapted to the uses of said real estate and by the actions and use of John Robertson, then the owner, intended to be fixtures to the realty."

Further in its findings of fact, the trial court said:

"The Court further finds that the plaintiff Bank of Poplar Bluff foreclosed their deed of trust March 31, 1947, and on June 2, 1948 sold the real estate in question to Plaintiffs, Guy Cruce and Imal Coral Cruce and took a deed of trust to secure the unpaid balance of the purchase price.

"The Court further finds that the defendant has no interest in and has not acquired any interest in and to the furnace, furnace blower, the furnace stoker, the furnace pipes, fluorescent electric lights, equipment, fixtures and switches and electric water cooler."

Whether the items here involved were a part of the real estate, or were at one time separated therefrom and were the personal property of John Robertson, does not involve the determination of the title to real estate, under the cases cited. If such items were a part of the real estate and were not personal property, such fact only determines the rights thereto of the parties in the suit, and does not involve title to the real estate itself.

Our task then, is to determine whether or not the trial judge was justified, under the evidence, in making the findings he did make.

While it is our duty, in an equity case, to decide the case according

to the law and the evidence in the case, and to reach our own conclusions thereon, we may not set aside the judgment of the trial court, unless such judgment is clearly erroneous, and due regard should always be given to the opportunity of the trial court to judge of the credibility of the witnesses, who testified in the trial.

Civil Code, Mo. R.S.A. Sec. 847.114 (d); Lowe v. Lowe, 229 S. W. (2d) 7, l. c. 13; A. A. Electric Machinery Co. v. Block, (Mo. App.) 193 S. W. (2d) 631, l. c. 635; St. Louis Union Trust Co. v. Busch, 346 Mo. 1237, 145 S. W. (2d) 426.

So we must examine the evidence in the case for ourselves, with this rule in mind.

Ed L. Abington was the first witness for plaintiffs (respondents). He was president of the Bank of Poplar Bluff. He testified to a conversation with John Robertson in November, 1947. Among other things, witness Abington said:

"Q. Colonel, did you have an occasion to go out and view this property before any loan—

A. Me and Mr. Saracinie went out and viewed it.

Q. He is cashier of the Bank of Poplar Bluff?

A. Yes, sir.

Q. That was before any loan was made?

A. Yes, sir.

Q. When you went out there will you describe to the court the buildings that you saw there at that time where the Cruce Pontiac Company is now located? Just more or less give a complete description of the building.

A. Well we went over the property and inspected it in contemplation of the loan.

Q. Now at the time you inspected this property Colonel, I will ask you with reference to specified items here. Did you have occasion to inspect the furnace at that time?

A. I did.

Q. Where was the furnace located?

A. In the basement.

Q. In the basement of the building?

A. Yes.

Q. And did you and Mr. Saracinie and Mr. Robertson go down and view the furnace down there?

A. Yes, sir.

Q. Do you recall what type of furnace it was?

A. Well it is what they call a hot air furnace, sheet iron sheet metal furnace with pipes running in different directions.

Q. Up —

A. Carrying the heat up in the building.

Q. These pipes were running upstairs is that correct?

A. Yes and heat from the furnace up to the upstairs part of the building that is on the street level.

"Q. That is where the shop is now of the Cruce Motor Company?
A. Yes and office.
Q. And at the time you went down there will you describe to the court the condition of the floor of the basement, if you recall?
A. Well the floor, the basement was all earth except the part that the furnace was sitting on and that was concrete, concrete block about, something like ten feet square, ten or twelve feet that the furnace was sitting on.
Q. Do you recall what portion of the basement that was located in?
A. I think it was in the Northwest part of the basement.
Q. Northwest corner of the basement?
A. Yes, sir.
Q. Can you state to the court whether or not the furnace was fastened down to the concrete, if you recall?
A. Well I don't know whether it was fastened with bolts or anything but it was on the concrete, sitting on the concrete.
Q. Sitting in the concrete?
A. Yes.
MR. COPE: He said on it. * * *
Q. * * * Now did you also see at that time any fluorescent lights out there Colonel Abington?
A. Yes there was some lights in the office and I believe out in the show room. I am not sure about that but I think that is right.
Q. They were in the show room, were they ceiling lights or do you recall?
A. Yes ceiling lights. * * *
Q. When you went out there Colonel Abington and talked to him regarding this loan, making this loan did you take into consideration that this furnace and other material or other items which I have mentioned here were a part of the consideration for the loan to be made?
MR. PONDER: Object to that because the written deed of trust itself shows on what the loan was made and any oral or verbal agreement that they might have had or understanding wouldn't change the terms of their written instrument.
Q. This isn't no oral or verbal agreement.
THE COURT: That is the exact issue that will be before the court as to interpretation of the instrument and I don't think it will hurt anything for the witness to answer this question. Let the objection be overruled and the court will consider it, whether it is proper to be considered at the time the case is to be passed upon.
MR. PONDER: All right.
Q. You remember the question Colonel?
A. Yes. Well when Robertson made the application for the loan, thirty thousand dollars we went out to inspect it, Saracini,

the cashier and myself. We went all over it and I think he had four or five small residence on the property. That is we went over all of it in the building and looked it over and of course we naturally wanted to know what kind of heating apparatus he had or accommodations and he took us down to the basement and showed us this furnace sitting there on the concrete and said it was part of the fixtures and I assumed that it was and we of course considered that in making the loan. We approved the loan of thirty thousand dollars.''

Girard L. Saracini, cashier of respondent Bank, testified for respondents, and corroborated Abington in all respects. His testimony, which is very long, we do not think it necessary to quote.

Jim Brown testified that Cruce of the Cruce Pontiac Company, later removed the furnace and probably other items from the garage building and placed others in their stead. His testimony tended to prove that the furnace and other items were in the garage building after Robertson left the garage.

Guy Cruce (one of the respondents) testified that the furnace was still in the same position when he came into possession of the garage later on.

William Casey, defendant below, and appellant here, testified that he got the furnace and the other items involved from the Butler County Finance Company, on February 6, 1948, and paid $6000 therefor. From his questions and answers, we reproduce the following:

''Now at the time you went out there and took charge after you bought this personal property, was this water cooler hooked up and in operation?
A. It wasn't at the place no, sir.
Q. It wasn't at that time?
A. No, sir.
Q. Who had that hooked up?
A. I had it hooked up myself.
Q. In other words you had the water pipe from the building there to go in and connect it up with the water tank?
A. That is right.
THE COURT: Did you put in any pipe?
A. Yes.
Q. I mean pipe from the source of the water supply or was that already there, was it just merely a connection, question of hooking it to the water fixture that was already there or did you have to run a pipe back to the source of supply?
A. I think we put in about twelve feet of pipe.
MR. COPE: Where did you run it from one of the water pipes in the building up to where the water tank was sitting?
A. Yes.

"Q. Then there was a connection there on the water tank to screw onto it?
A. Yes.
Q. And then that let the water come in?
A. Yes.
Q. Now was the stoker connected up to the furnace?
A. Yes.
Q. It was all in operation when you went out there?
A. Well I would say no because we had something done to it but as far as knowing what was done to it, they hooked it up and got it in operation when I got there. What they done to it I don't know.
Q. Now was this furnace fastened in any way or just sitting there on the concrete block?
A. Just sitting on the concrete block.
Q. The furnace, I mean the basement of that building was not concreted I believe.
A. It wasn't.
Q. Now, was all the pipes to the furnace running around all of the rooms when you went there?
A. No there wasn't. We hooked one pipe from the big pipe.
Q. Now these fluorescent lights, they are lights that are in the main building there?
A. Yes.
Q. How many of those were there there?
A. There was sixteen large ones and four small ones.
Q. And there was a fan there in the building I believe, a circulating fan or something?
A. Yes.
Q. Now did you buy all those articles from the Butler County Finance Company?
A. I didn't buy the fan.
Q. Did you get the fan, where did you get it?
A. You mean to the stoker?
Q. That is right, the fan is in the stoker.
A. Yes I bought all that.
THE COURT: You bought what now?
A. The fan and stoker.
THE COURT: Maybe I misunderstood you, was the fan, you mean the fan was part of the stoker or was part of the blower to blow the hot air in?
A. Yes.
Q. Sitting over to the side of the furnace, was it attached to it?
A. It wasn't attached now. It wasn't attached to the furnace.
Q. Didn't have a hood or anything over it?
A. I wouldn't be sure whether it had a hood over it or not but it wasn't attached because I had it attached to the furnace after I got out there.

"Q. You had the fan or the blower—
A. The blower.
Q. Was it there though when you went out there?
A. It was there."

Loring McCain was called as a witness by appellant. Although he claimed to have received a bill of sale from Robertson for the furnace and other property here involved, his testimony failed to corroborate the testimony of appellant Casey in many respects. He said that the furnace and other items were in the garage building when Casey went into it; that they belonged to the Butler County Finance Company, and he made no claim to them. He admitted, on cross-examination, that Girard Saracini made some claim to the property for the bank at the time the Finance Company foreclosed its chattel mortgage. When questioned by the trial judge, he said that he had made no claim to the property against the Butler County Finance Company.

Eli Sliger testified that John Robertson, d/b/a Robertson Motor Company, made a chattel mortgage to Butler County Finance Company on August 11, 1947, and, at that time, the property was "in transit," which must have been before Robertson gave a deed of trust on the property to respondent bank. The Finance Company sold the property under its chattel mortgage and bought it in.

The trial court evidently did not believe that the chattel mortgage to the Butler County Finance Company and the foreclosure of that chattel mortgage were in good faith, for the trial court said:

"The Court further finds that John Robertson sold the real estate in question to Loring McCain January 2, 1948, subject to plaintiff Bank of Poplar Bluff's deed of trust, and also the personal property described in said chattel mortgage and subject to said chattel mortgage; that said Loring McCain leased the real estate and sold the personal property to the defendant; that all the aforesaid transactions were subsequent to plaintiff Bank of Poplar Bluff's deed of trust and subsequent to the annexation, use, adaption and intention of said John Robertson to make the furnace, stoker, blower, light fixtures and water cooler fixtures herein."

Dennis Berry testified for defendant about a meeting attended by Abington, Saracini, McCain, Casey, one of the boys from St. Louis, and others. He testified to an agreement between the Bank and the Finance Company, as to the conditions on which appellant Casey could get a lease on the garage building. He did not attempt to describe the property claimed by the Finance Company, and gave no testimony to any statement concerning that from respondent Bank.

The only other witness put on the stand by appellant was Beulah Robertson, from the office of the Recorder of Deeds. Her testimony was limited to the similarity of an instrument produced with an original of the same kind recorded in her office.

We are satisfied that there was ample substantial evidence in the transcript to support the finding of the trial judge that the furnace and other items involved were in the garage, and attached to it as a part thereof by Robertson, at the time respondent Bank made its loan to Robertson. If the Finance Company, before that time, had permitted Robertson to attach the property involved to the real estate and to procure a loan from the Bank, after such attachment to the real estate, its claim of title to the personal property involved, before the alleged sale to appellant and the execution of the deed of trust to the Bank, comes with poor grace, to say the least.

Whether or not the furnace and the other items involved were fixtures in the garage at the time respondent Bank made its loan to Robertson, had nothing in the World to do with the title to the real estate itself, and the only question for the trial court and for this Court to decide is whether or not respondent Bank and the Cruces had sufficient interest in such property to warrant the issuance of an injunction against appellant to prevent him from removing that property from the real estate covered by the deed of trust, held by Respondent Bank.

The trial court had the right to believe respondents' witnesses, and to disbelieve appellant and his witnesses, and to find that such property was attached to and a part of the real estate covered by the deed of trust, held by respondent Bank, and later sold to the Cruces, subject to such deed of trust. We feel that the judgment of the trial court in this respect should be approved.

Appellant made ten assignments of error in his brief. What we have said above and what we have approved in the findings of the trial court, dispose of most of these assignments, and we see no necessity of lengthening this already long opinion by quoting such assignments. Where appellant charges that the trial court did not always quote the testimony correctly, such quotations have been omitted by us. The other assignments are clearly against the law and the evidence in this case, and we overrule all of appellant's assignments of error.

Finding no error in the trial of the case, or merit in appellant's assignments of error, the judgment of the trial court should be and is approved, and that judgment is affirmed.

It is so ordered. *Vandeventer, P. J.,* concurs; *McDowell, J.,* concurs.